IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JASON M.,

                Plaintiff,

      v.                              Civil Action 3:24-cv-144
                                     Magistrate Judge Kimberly A. Jolson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

## OPINION AND ORDER

Plaintiff, Jason M., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **GRANTS** Plaintiff's Statement of Errors (Doc. 8), **REVERSES** the Commissioner of Social Security's non-disability finding for the period prior to May 21, 2023, and **REMANDS** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.      BACKGROUND

Plaintiff protectively filed applications for DIB and SSI on July 23, 2018,[1] alleging disability due to chronic neck pain; chronic back pain; depression; nerve pain in right foot and leg; arthritis in both hands; arthritis in both ankles; diabetes; constant headache; and brain surgery for aneurism. (R. at 280–88, 289–94, 315). After Plaintiff's applications were denied initially and upon reconsideration, he received a hearing before Administrative Law Judge ("ALJ") Stuart

---

[1] Plaintiff previously filed for benefits on February 26, 2015. Those applications were denied by administrative decision on January 31, 2018. (R. at 81–103).

Adkins. (R. at 45–80). The ALJ denied benefits in a written decision on June 24, 2020. (R. at 17–44).

After the Appeals Council denied review, Plaintiff filed a case in the United States District Court for the Southern District of Ohio. This Court remanded the matter to the Commissioner. *See Jason M. v. Comm'r of Soc. Sec.*, No. 3:21-cv-272 (S.D. Ohio September 30, 2022); (R. at 1667–96). This matter was then remanded by the Appeals Council on December 20, 2022. (R. at 1699–1703). Upon remand, ALJ Adkins held a subsequent hearing via telephone on November 13, 2023, (R. at 1617–38), and issued a partially favorable decision finding Plaintiff disabled under SSI beginning on May 21, 2023. (R. at 1573–1616). Plaintiff did not request review by the Appeals Council opting to directly file suit with this Court.

Plaintiff filed the instant case seeking a review of the Commissioner's decision on May 7, 2024 (Doc. 1), and the Commissioner filed the administrative record on June 18, 2024 (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 8, 10, 11).

### A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and the testimony from the two administrative hearings as follows:

> *** In September 2018, [Plaintiff] completed a function report, demonstrating an ability to read, use his hands to write, and follow instructions (Exhibit B3E). [Plaintiff] indicated trouble with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others (Exhibit B3E/4). He stated he was limited to lifting five pounds (Exhibit B3E/4). He reported that he was not able to pay attention for very long since his brain surgery (Exhibit B3E/4). He stated he did not get along with authority figures due to his pain, and he had been fired due to problems getting along with others, as he was not good at being told what to do (Exhibit B3E/5). He did not handle stress or changes in routine very well (Exhibit B3E/5). He reported he had a short temper (Exhibit B3E/5). He indicated he got very little sleep and had some trouble attending to his personal care due to his pain (Exhibit B3E/2). Side effects of medication included feeling tired and lightheaded (Exhibit B3E/6). On

appeal, [Plaintiff] noted bipolar disorder, anxiety, and OCD (Exhibit B4E/2). He reported anger, mood swings, nightmares, and memory problems (Exhibit B5E/7). In a 2019 report of contact, [Plaintiff] stated his condition had gone downhill since his brain surgery, including difficulty with balance and memory (Exhibit B7A/6). He noted he has fallen a few times without injury (Exhibit B7A/6).

At his 2020 hearing, [Plaintiff] testified that he had a compressed back. If he stood too long, his back hurt bad, and he also had numbness in the left leg from the knee down. His leg drags. He reported that the "nerves were gone." He stated he had two surgeries on his right arm for cubital tunnel syndrome, and he now had a gaping hole. He indicated he was having similar problems in the left arm with numbness from the fingers to elbow, and he cannot use his arms very easily. He stated that both shoulders had tears, and he had bone spurs in his neck. He broke coffee cups and spilled milk. He noted a recent incident where he could not get out of the shower and had to call the EMT for help. He reported that he had braces for his knee, right elbow, and back. He stated that that laying down was the best position for him, as it took pressure off his back. If he was around stairs, he tried to take elevators, or he had to go slow and hold onto handrails. He cannot drive for long periods of time before he had to change positions. He had trouble lifting a half-gallon of milk because his hands do not cooperate. He would have to slide a small object off a table to pick them up, and he had difficulty with zippers and buttons. He reported that showering was a chore, and he had to lay down afterward. He did not shave until he had to. He spent most of his time, approximately 80% of the day, on his back. He took medication every six hours and slept about four hours at a time. He took twenty- to thirty-minute naps throughout the day, and his medication made him drowsy. He reported his memory was not as good as it used to be. He reported issues with irritability.

At his 2023 hearing, [Plaintiff] testified that he had a total of four surgeries on both arms, including the tendons and ligaments. His function was about the same as at the prior hearing, noting that his pain was not quite as intense, but his grip was worse. He dropped things constantly, and any type of lifting caused him to have pain for multiple days afterward. He still had back pain. He reported that he had a nerve burned down in his back, and his pain came back worse than it had been. He did not bend over to pick anything up, and he tried to rest as much as possible. He had numbness and tingling in the legs, and he had vein surgery on the right leg. He stated an EMG reportedly confirmed nerve damage in the leg. He had swelling within five minutes of walking, and he also had cramps in the legs. He indicated he used ice, and he stood on a ball for his foot pain. He noted difficulty balancing. He reported that he had headaches all of the time on the left side of his head, and there were times where it caused him to stop and lay down. He noted difficulty sleeping, reporting he was lucky if he slept two hours per night due to pain. He stated he took naps for about thirty minutes. [Plaintiff] testified to trouble with focusing. Pain caused irritability, and he can get very angry with an inability to see consequences. He tried not to go anywhere due to concerns of verbal and physical altercations. He did not want to get out of bed almost every day, but he had to get up and try to

3

move about to keep his pain from getting worse. He stated he was limited to sitting for five minutes before he had to adjust himself, and he was worse with standing. He walked on the ball of his foot, and he was limited to standing about five to ten minutes. He was only able to sit for five to ten minutes before having to lay down.

(R. at 1584–85).

### B. Relevant Medical Evidence

The ALJ summarized the medical records as to Plaintiff's physical orthopedic impairments

as follows:

> ***A herniated disc was noted by 2012 (e.g. Exhibit B3F/2). By 2013, chronic neck pain was noted (e.g. Exhibit B3F/2). August 2016 x-rays of the lumbar spine showed only mild multilevel degenerative changes of the lumbar spine and grade 1 retrolisthesis of L2 on L3 with mild anterior wedging of L1 (Exhibit B3F/127). Cervical x-rays showed only mild degenerative changes with no acute fracture or listhesis (Exhibit B3F/126). An October 2016 cervical MRI was normal with no more than "very mild" endplate hypertrophy, patent central canal and neural foramen, and no disc herniation or nerve root impingement (Exhibit B3F/125). In a February 2018 emergency room visit for a headache, [Plaintiff] reported that the pain radiated into his arm and shoulder (Exhibit B1F/3). On examination, [Plaintiff] did not appear to be in obvious distress (Exhibit B1F/5). He complained of tenderness to palpation of the neck and upper arm, but he had good range of motion in all major joints with no swelling, normal sensation, and normal motor function (Exhibit B1F/5). He appeared to be able to use the extremity normally (Exhibit B1F/5). In March 2018, [Plaintiff] began complaining of right hip pain after falling when getting into his truck (Exhibit B3F/63). X-rays of the right hip were negative (Exhibit B1F/62). That month, treatment notes indicate a significant reduction in chronic opioids for his neck complaints (Exhibit B3F/63). On examination, he had some tenderness to palpation and range of motion of the neck and shoulder extremities, but Tinel's testing was negative in the elbows and wrists (Exhibit B3F/65). He had right hip tenderness to palpation of the grater trochanter, but range of motion was intact (Exhibit B3F/65). He had normal strength in the bilateral upper and lower extremities (Exhibit B3F/56). Gait, sensation, balance, and coordination were within normal limits (Exhibit B3F/66). April 2018 treatment notes from after his aneurysm surgery indicate that [Plaintiff] had pain in the left groin just distal to the insertion site of his catheter with some burring in the area, and he had an aching pain with ambulation and a burning sensation at rest radiating from the groin down to the knees (Exhibit B3F/33). Pain management notes also indicate radiation of neck pain into his head and lower back into his legs with numbness and tingling sensations in the arms and hands (Exhibit B4F/1). On examination, he had tenderness to palpation with some reduced cervical and lumbar range of motion (Exhibit B4F/4). Straight leg raising was positive (Exhibit B4F/4). However, strength was only slightly reduced in the bilateral lower extremities at 4/5 with full

5/5 strength in the bilateral upper extremities, which had normal sensation (Exhibit B4F/4). He had a normal gait without an assistive device, and he did not have a foot drop condition (Exhibit B4F/3). He was able to get on/off the examination table, along with heel and to walk, despite some discomfort (Exhibit B4F/3). ***

June 2018 pain management notes reflect that he was unable to receive Norco sent in by his pain management provider because he already received it from his primary care provider, but he was hoping additional medication could be prescribed for break-through pain (Exhibit B4F/17). He was informed that he cannot receive opioid medication from two different providers (Exhibit B4F/17). He was not interested in offered physical therapy or injections, and he indicated he was going to discontinue care at that office because he did not get the medication he wanted (Exhibit B4F/17). July 2018 primary care notes reflect complaints of paresthesias in the right lower extremity since his embolism was coiled (Exhibit B3F/4). He stated he was managed with Elavil, but it provided very little relief of symptoms (Exhibit B3F/4). However, he was on Norco for his chronic neck pain, and he said it worked well for his leg pain also (Exhibit B3F/4). He acknowledged that he did not have weakness or difficulty with ambulation, and he reported that neurosurgery believed his symptoms would improve in time (Exhibit B3F4). He reported that his pain management provider decided to stop prescribing opioids and instead do cervical injections, which he was not agreeable to, and he wanted to see a new provider (Exhibit B3F/4). On examination, sensation was intact to the upper and lower extremities with full 5/5 strength (Exhibit B3F/6). His records indicate that his EMG did not show denervation injury despite neurology feeling it was a possibility, and it was a slow process to heal but should continue to improve (Exhibit B3F/8). However, the electrodiagnostic studies showed findings of sensory neuropathy in the foot but with no evidence of lumbosacral radiculopathy or plexopathy (Exhibit B3F/13). On physical examination when he had his EMG, straight leg raising was within normal limits, sensations were intact, and strength was full 5/5 (Exhibit B3F/13). His neurology notes reflect acknowledgement that his right leg and groin pain were slowly improving, and he was "not too concerned with it" (Exhibit B3F/9). His neck pain and headaches were also improving (Exhibit B3F/9). On examination, casual gait was normal, finger-to-nose and rapid alternating movements were normal, and he had full 5/5 strength in the bilateral upper and lower extremities (Exhibit B3F/10). ***

He returned to his pain management provider in July because his primary care provider stopped prescribing Norco (Exhibit B4F/18). On examination, he had tenderness and decreased range of motion in the cervical and lumbar spine (Exhibit B4F/19). Muscle strength was reduced to 4/5 in the bilateral upper and lower extremities, but muscle strength and handgrip was still considered "okay" in the bilateral upper extremities (Exhibit B4F/20). October 2018 emergency room notes show complaints right-sided neck pain after lifting a pot (Exhibit B12F/68). On examination, he had normal range of motion in the neck with no tenderness to palpation (Exhibit B12f/74). He had good range of motion in all major joints (Exhibit B12F/74). His neck CT was unremarkable (Exhibit B12F/70). Pain

management notes from that month still reflect that he was not interested physical therapy (Exhibit B23F/11). November 2018 neurology notes show complaints of motor skills issues after several "blows to the head", and he was dropping things, particularly in the right hand (Exhibit B9F/4). He requested additional pain medications to address a fractured rib, but his pain management provider declined to prescribe them (Exhibit B23F/15). His medications were going to be adjusted the next month, as he was not truthful as to how he obtained the injuries and was now considered high risk (Exhibit B23F/15). At his next visit, his urinary drug test was positive for alcohol, and he was informed that he is not to consume alcohol with his prescribed medications (Exhibit B23F/19). He received his first cervical epidural steroid injection at C5-6 at that visit (Exhibit B23F/22). December 2018 pain management notes reflect that a recent urinary drug screening was negative for Norco, which [Plaintiff] reported was because his wife was upset after his hospitalization and flushed all of his medication down the toilet (Exhibit B23f/26). His records reflect that if any further inconsistent and/or aberrant behavior was found on urinary drug screenings, he would be placed on a non-opioid treatment plan (Exhibit B23F/26). His treatment notes reflect greater than 50% improvement in pain and function with his cervical epidural injection (Exhibit B23F/34). He was able to travel out of town, which caused him to miss a pill count (Exhibit B23F/30). Physical therapy continued to be recommended, but he still was not interested (Exhibit B23F/34). In February and March 2019, [Plaintiff] received additional cervical epidural steroid injections at C5-6 (Exhibit B23F/36, 43). He acknowledged greater than 60% improvement in pain and function (Exhibit B23F/47). He continued to refuse physical therapy (Exhibit B23F/47). ***

In April 2019, [Plaintiff] received his first lumbar epidural steroid injection at L4-5 (Exhibit B23F/49). He acknowledged over 90% improvement in pain and function with his lumbar injection, but it only lasted one and a half weeks (Exhibit B23F/53). April 2019 neurology notes show complaints of being unsteady while walking at times, and he had fallen twice without injury (Exhibit B13F/1). On examination, he had normal neck range of motion and full 5/5 strength in the bilateral upper and lower extremities, both proximally and distally (Exhibit B13F/3). Peripheral sensation was intact, and finger-to-nose and rapid alternating movements were normal (Exhibit B13F/3). Casual gait was normal (Exhibit B13F/3). In May 2019, [Plaintiff] received another lumbar epidural steroid injection (Exhibit B24F/2). June 2019 pain management notes indicate that he had over 90% improvement in pain and function for a few weeks (Exhibit B24F/10). That month, [Plaintiff] reported to the emergency room with complaints of right elbow pain with swelling and decreased range of motion (Exhibit B14F/7). He had intermittent discomfort over the past several years, but this pain was attributed to twisting in screws while fixing a door (Exhibit B14F/11). He denied numbness or tingling (Exhibit B14F/11). On examination, he had reproducible discomfort, but motion and sensation were intact (Exhibit B14F/14). He was able to flex and extend without difficulty, and he had no tenderness to palpation in the hand, wrist, forearm, or shoulder (Exhibit B14F/14). His right elbow x-rays showed no acute osseous abnormality (Exhibit B14F/32). July 2019 pain management notes reflect edema in

6

the area of the right elbow, which he stated was painful (Exhibit B24F/17). He noted that his lumbar injections provided 60% pain relief for two months (Exhibit B24F/17). In August 2019, [Plaintiff] received his third lumbar epidural steroid injection at L4-5 (Exhibit B24F/20). That month, bilateral shoulder x-rays showed only mild right-sided degenerative changes with no acute abnormality identified (Exhibit B14F/5). Orthopedic notes from the next month showed full 5/5 strength at the elbow, but there was possibly some instability (Exhibit B15F/2). He refused hand master therapy (Exhibit B19F/17). Accordingly, findings on examinations and imaging studies, along with his refusal of some conservative treatment modalities, does not support symptoms or limitations as severe as alleged.

In September and October 2019, [Plaintiff] underwent an intraarticular injections to the right shoulder (Exhibit B24F/26, 28). He also received intraarticular injections to the left shoulder (Exhibit B24F/34, 37). November 2019 orthopedic notes for his shoulders reflect that he did not do prescribed therapy but was doing home exercise instead (Exhibit B19F/15). He noted bilateral shoulder injections from his pain management provider gave him some relief (Exhibit B19F/15). An ultrasound of the right shoulder showed early degenerative changes at the acromioclavicular joint, mild supraspinatus tendinopathy, and a partial tear involving the subscapularis tendon with adjacent tendinopathy but no full-thickness tear (Exhibit B19F/23). That month, he underwent a percutaneous tenotomy of the chronic lateral epicondylitis of the right elbow (Exhibit B19F/22). December 2019 x-rays of the lumbar spine showed only mild multilevel endplate spurring with slight retrolisthesis at multiple levels, but no other remarkable findings were observed (Exhibit B18F/22). His orthopedic specialist again offered formal therapy for his shoulders, but he preferred to continue home exercises (Exhibit B19F/8). January 2020 orthopedic notes show complaints of constant sharp pain and numbness in the fingers (Exhibit B19F/1). On examination, he had full range of motion of the wrists and fingers bilaterally (Exhibit B19F/1-2). His right wrist had full 5/5 strength in the APB and intrinsic, though he had positive Tinel's at the carpal tunnel, direct carpal tunnel compression, and Phalen's tests (Exhibit B19F/1). His shoulders had some reduction in range of motion bilaterally, but he maintained full 5/5 strength (Exhibit B19F/4). His bilateral EMG and nerve conduction study demonstrated evidence of ulnar mononeuropathy localized to the level of the medial epicondyle segment with cubital tunnel syndrome of the bilateral upper limbs, and the right was noted to be slightly worse than the left (Exhibit B19F/19). Regardless, the severity was noted to be "quite mild" with evidence of mild demyelination across the medial epicondyle segment alone with no convincing evidence of axonal sensory or motor involvement (Exhibit B19F/19). Otherwise, there was no convincing evidence of another localized mononeuropathy, acute/chronic cervical or thoracic radiculopathy, large fiber polyneuropathy, myopathy, plexopathy, ganglionopathy, or alpha motor neuron disease (Exhibit B19F/19). February 2020 pain management notes reflect that [Plaintiff] refused to participate in a functional capacity evaluation required for paperwork to be completed (Exhibit B24F/53). ***

March 2020 orthopedic notes continued to show full range of motion and strength in the upper extremities despite his decreased sensation and abnormalities on special testing (Exhibit B20F/1). He underwent a cubital tunnel release with neurolysis ulnar nerve of the right elbow (Exhibit B21F/16). Postoperative treatment notes show complaints of tingling, numbness, and weakness despite stating he was doing good (Exhibit B25F/1). His paresthesia in the ulnar distribution was slowly improving (Exhibit B25F/2). That month, an ultrasound of his left shoulder showed mild long head biceps tenosynovitis, a small partial tear at the attachment of the subscapularis tendon, and mild supraspinatus tendinopathy with no evidence for full-thickness rotator cuff tearing (Exhibit B20F/7). In March 2020, [Plaintiff] reported to the emergency room with complaints of back pain radiating into the right lower extremity with numbness in the leg (Exhibit B22F/1, 6). He was supposed to get an epidural that day, but it was cancelled (Exhibit B22F/1, 6). On examination, he had full 5/5 strength in the bilateral lower extremities, though he appeared uncomfortable and slow-moving with position changes (Exhibit B22F/10). A May 2020 MRI of the lumbar spine showed overall mild discogenic changes greatest at L3-4 where there was a diffuse disc bulge with facet and ligamentous overgrowth with mild central canal and right lateral recess narrowing (Exhibit B28F/474). There was a far left lateral disc protrusion at L2-3 and a mild central disc bulge at L4-5 without lateralizing disc herniation (Exhibit B28F/474). June 2020 neurology notes showed some worsening symptoms after driving for two hours (Exhibit B33F/10). On examination, he had some slight reduction in left hip and knee strength that was rated 4/5, and the remainder of his bilateral upper and lower extremity strength was a normal 5/5 (Exhibit B33F/13). His gait was antalgic, and he had some decreased sensation in the right lower extremity (Exhibit B33F/13). In July 2020, [Plaintiff] reported to the emergency room after a motor vehicle accident (Exhibit B28F/183). CTs of the lumbar and thoracic spine showed degenerative changes with no acute fractures (Exhibit B28F/189-190). His cervical CT showed no acute findings (Exhibit B28F/191). X-rays of the left shoulder, left wrist, left elbow, and right wrist showed no acute osseous abnormalities or fractures (Exhibit B28F/190). A September 2020 lumbar injection provided improvement (e.g. Exhibit B37F/2). ***

In October 2020, [Plaintiff] reported to the emergency room with complaints of swelling in the left forearm with some pain (Exhibit B28F/176). About two weeks later, he returned to the emergency room with complaints of left elbow pain and swelling for a month (Exhibit B28F/165). He stated that he was only there for referral to an orthopedist (Exhibit B28F/170). On examination, he had some fullness but full range of motion (Exhibit B28F/170). X-rays showed a joint effusion with no acute fractures identified (Exhibit B28F/174). In December 2020, he was able to hang pictures, which required the use of a hammer (Exhibit B28F/146). February 2021 treatment notes reflect full 5/5 strength in the upper extremities with some reduced range of motion and tenderness (Exhibit B28F/125). X-rays showed no fracture, dislocation, bony lesions, or significant arthritic change (Exhibit B28F/125). The MRI of the left elbow showed a complete tear of the radial collateral ligament, tendinosis with a full-thickness tear involving the common

extensor tendon with signal abnormality involving the extensor carpi ulnaris muscle consistent with strain injury with minimal partial tear, elbow joint effusion consistent with synovitis, minimal spurring involving the coronoid process of the ulna, and signal abnormality involving the subchondral aspect and cartilage of the radial head along its ulnar aspect most consistent with chondromalacia with chondromalacic osseous change with subchondral cyst formation versus osteochondral injury (Exhibit B28F/459). Nevertheless, treatment notes show that, in January 2021, right grip was 78 pounds with pinch strength of 16 pounds while left grip strength was 60 pounds with a key pinch strength of 17 pounds (Exhibit B34F/19). In March 2021, he underwent a left debridement of the extensor tendon and repair of the elbow, and he had a left elbow repair of the lateral collateral ligament (Exhibit B28F/134). At his postsurgical occupational therapy appointment, he noted he only used his elbow brace when leaving home but not when sleeping despite being told to wear it all times due to risk of re-injury, especially when sleeping (Exhibit B28F/439). April 2021 orthopedic notes reflect that he was doing well after his left-sided surgery but was reporting increasing symptoms on the right side (Exhibit B32F/12). Nevertheless, pain was controlled (Exhibit B32F/12).

Pain management notes from May 2021 reflect that his pain levels were about the same with no major changes, and his current regimen seemed to be working (Exhibit B31F/116). May 2021 orthopedic notes reflect significant improvement in the left elbow since his surgery, but he had no significant improvement in his right lateral epicondylitis symptoms (Exhibit B28F/77-78). An MRI of the right elbow only mild spurring involving the olecranon process of the ulna and mild signal change involving the origin of the common extensor tendon most consistent with minimal tendinosis and/or postsurgical change with no evidence of a tendon tear (Exhibit B28F/415). He participated in four postoperative occupational therapy appointments into July 2021 (Exhibit B28F/334). At his initial evaluation for his right elbow, he had no pain with rest but 5/10 pain with use (Exhibit B28F/401). He also noted taking a long driving trip a few weeks later that resulted in neck pain radiating down his arm through his elbow (Exhibit B28F/401). In June 2021, he underwent a right debridement of the extensor tendon and repair of the elbow (Exhibit B28F/87). Orthopedic notes reflected mild edema in the right small finger with stiffness and decreased range of motion, though he was able to fully extend the finger (Exhibit B34F/9). Sensation and motor function was intact (Exhibit B34F/10). July 2021 x-rays of the left knee were normal-appearing (Exhibit B28F/314). August 2021 left knee injections provided 20% relief, and he received 95% improvement after an injection the next month (e.g. Exhibits B31F/94, 101; B37F/1). Pain management notes reflect he was stable with his current level of pain control, and he was able to perform activities of daily living and maintain functionality (Exhibit B31F/98). In November 2021 and January 2022, he told his pain management provider that he was not interested in a spinal cord stimulator trial (Exhibit B31F/78, 84). ***

The February 2022 x-ray of the right shoulder showed no acute abnormality with stable, mild glenohumeral and acromioclavicular degeneration and minimal calcification along the greater tuberosity that may be due to calcific tendinitis (Exhibit B28F/284). Pain management notes reflect that motor strength was intact and symmetrical in all four extremities, and he had intact and symmetrical sensation in the upper and lower extremities (Exhibit B31F/74). Gait was normal (Exhibit B31F/73). Physical therapy for the neck and right shoulder were ordered (Exhibit B31F/75). That month, his orthopedic treatment notes reflect complaints of a bump on the elbow with only intermittent pain, which he noted was better than before his surgery, though he had some residual cubital tunnel symptoms (Exhibit B32F/1). On examination, he had some tenderness to palpation with a small amount of palpable scar tissue noted, but he had minimal swelling (Exhibit B32F/3). He complained of discomfort/irritation with palpation over the ulnar nerve medially with some paresthesias in the ulnar nerve distribution (Exhibit B32F/3). He had no pain with resisted wrist extension and only mild lateral pain with resisted wrist flexion (Exhibit B32F/3). He had near full extension with full pronation, supination, and elbow flexion (Exhibit B32F/3). He had full 5/5 triceps and biceps strength (Exhibit B32F/3).

The March 2022 steroid injection of the right shoulder provided 90% relief (e.g. Exhibit B37F/2). X-rays of the cervical spine showed degenerative changes without acute osseous abnormality (Exhibit B28F/272). April 2022 pain management notes reflect 85% improvement after a left shoulder injection the month prior, and he was very happy with the results (Exhibit B31F/63, 66). He did not want any other injections at that visit (Exhibit B31F/63). In August 2022, [Plaintiff] was able to change a tire (Exhibit B28F/29). He also went fishing that month (Exhibit B28F/46). In September 2022, [Plaintiff] reported to the emergency room after a near fall with pain in the lower back, neck, and left shoulder and arm after catching himself (Exhibit B28F/9). On examination, he had symmetric strength throughout the bilateral and upper lower extremities (Exhibit B28F/16). He had a normal gait (Exhibit B28F/16). He noted a slight tingling at the tips of his fingers of the left hand, but his sensation as normal in the lower extremities (Exhibit B28F/16). X-rays of the lumbar spine showed only mild multilevel degenerative disc disease with facet arthropathy of the lower lumbar spine and mild retrolisthesis of L2 on L3 and L3 on L4 (Exhibit B28F/260). An October 2022 cervical CT showed multilevel cervical spondylotic disease most prominent at the C3-4 level (Exhibit B28F/247). November 2022 bilateral medial branch blocks at L4-5 and L5-S1 provided 80% relief (e.g. Exhibits B31F/55; B37F/1). Neurology notes show complaints of progressive left-sided neck pain that improved with medication and resting (Exhibit B33F/1). On examination, he had normal heel to toe steppage, tandem walking, and was able to walk on his tip toes and heels (Exhibit B33F/5). Spurling was negative, and he and normal range of motion in the spine (Exhibit B33F/5). Strength was a full 5/5 throughout the bilateral upper and lower extremities (Exhibit B33F/5). Sensation was intact (Exhibit B33F/6). Physical therapy with manual traction and continued injections were recommended (Exhibit B33F/7). A December 2022 cervical epidural steroid injection provided 80%

improvement (e.g. Exhibits B31F/47; B37F/1). A right elbow x-ray from that month showed no fracture, dislocation, or significant arthritic changes (Exhibit B32F/53). ***

January 2023 pain management notes reflect that his pain levels were about the same with no major changes, and his current regimen seemed to be working (Exhibit B31F/44). A February 2023 right intra-articular sacroiliac joint block provided 80% relief (e.g. Exhibits B31F/31; B37F/1). An x-ray of the right hip showed no acute abnormality (Exhibit B28F/231).

Orthopedic notes from that month reflect bilateral trigger ring fingers with Dupuytren's disease of the palm of both hands (Exhibit B34F/1, 5). On examination, he had intact sensation in the median, radial, and ulnar distributions with full 5/5 strength (Exhibit B34F/4). His provider did not think that treatment for Dupuytren's disease was necessary at that time (Exhibit B34F/5). Injections were offered for the trigger fingers, which were completed at that visit, and he was advised to wear wrist braces at night (Exhibit B34F/5). March 2023 bilateral medial branch blocks at L4-5 and L5-S1 provided 100% relief (e.g. Exhibits B31F/19, 23; B37F/1). Emergency room notes from that month show complaints of right leg pain and numbness for about a month, and he reported that injections to the posterior hip had not significantly helped his discomfort (Exhibit B30F/15). He reported he was starting to feel pain and numbness in the right arm, which was radiating into the right shoulder and right side of the face with some decreased sensation (Exhibit B30F/15). On examination, sensation, motor function, coordination, and gait were intact (Exhibit B30F/18). April 2023 neurology notes show complaints of pain radiating from his right posterior neck into the face and down into his bicep as a shocking numbness sensation, and he had progressively worsening balance issues (Exhibit B35F/1). On examination, he had full 5/5 strength throughout all extremities (Exhibit B35F/4). He had intact sensation except in the right upper extremity C5 nerve distribution (Exhibit B35F/4). He had tandem gait (Exhibit B35F/4). His May 2023 cervical CT showed degenerative changes with little change from a July 2020 study with no acute bony injury (Exhibit B35F/14). A May 2023 radiofrequency ablation at the right sacroiliac joint injection provided 85% relief (e.g. Exhibits B31F/10; B37F/1). The steroid injection of the left knee provided 100% relief (e.g. Exhibits B31F/7; B37F/2). His June 2023 right radiofrequency ablation at L4-5 and L5-S1 provided 100% relief (e.g. Exhibit B37F/2, 17). ***

[His] August 2023 left radiofrequency neurotomy at L4-5 and L5-S1 provided 50% relief (e.g. Exhibit B37F/2, 10). At his pain management appointment that month, he stated his usual pain level was only 4/10 (Exhibit B37F/1). On examination, he had tenderness to palpation in the lumbar spine, cervical spine, and right shoulder, but he had normal gait (Exhibit B37F/6). He received another cervical epidural steroid injection at C7-T1, which provided 30% relief (Exhibit B37F/1, 3). October 2023 x-rays of the right knee showed no acute osseous abnormality (Exhibit B38F/25). His shoulder x-ray showed no acute osseous abnormality, mild

glenohumeral arthrosis, and a small calcific density projecting over the greater tuberosity that may relate to hydroxyapatite deposition disease (Exhibit B38F/26). October 2023 emergency room notes show complaints of pain and intermittent numbness in the right shoulder down the elbow for two months (Exhibit B38F/9, 12). He reported his pain management provider was planning to do injections (Exhibit B38F/9). On examination, he had subjective decreased tenderness to the posterior right arm where he states he can feel it, but it "just feels strange" (Exhibit B38F/15). His grip strength was equal bilaterally (Exhibit B38F/15). Therefore, the record does not support symptoms as intense, persistent, or limiting as alleged. Despite over five years of treatment during the period under review, [Plaintiff]'s pain management provider noted that he maintained stable pain complaints despite a number of impairments contributing to pain (Exhibits B1F-B38F). While some abnormalities were noted on physical examinations, he nevertheless usually maintained relatively good strength, including with respect to grip, and a normal gait without the use of any assistive devices (Exhibits B1F-B38F). With the exception of his elbow surgeries, he was treated conservatively with injections, radiofrequency ablation, bracing, a TENS unit, and medication with subjective reports of improvement (Exhibits B1F-B38F). Accordingly, the reduced range of sedentary work in the above residual functional capacity fully accommodates [Plaintiff]'s pain and related symptoms while giving him the full benefit of the doubt with respect to his subjective complaints. His strong and symmetrical grip strength does not support additional manipulative limitations, and there is no evidence of lower extremity edema or other abnormalities on examination that would support elevating his legs. ***

(R. at 1585–93).

In addition, the ALJ summarized Plaintiff's mental health records:

The record also demonstrates a longstanding history of mental impairments complicated by alcohol abuse, but the record does not support symptoms as intense, persistent, or limiting as alleged. A depressive disorder was noted by 2012 (e.g. Exhibit B3F/2). By 2013, [Plaintiff] was diagnosed with alcohol abuse (e.g. Exhibit B3F/2).

By early 2018, [Plaintiff] was diagnosed with an anxiety disorder, and he was taking medication for his mental health (Exhibit B3F/63). In April 2018, [Plaintiff] was brought to the emergency room with suicidal ideation and a near-attempt with a gun (Exhibit B3F/21). He wanted to leave against medical advice despite being pink slipped, and he threatened the campus police and other staff (Exhibit B3F/22). He required restraints (Exhibit B3F/22-23). He reported drinking a few beers that night, which was his first drink since his aneurysm surgery (Exhibit B3F/22). He was hospitalized for three days (Exhibits B10F and B17F). The next month, he participated in an initial psychiatric evaluation, reporting symptoms of depression, lack of energy, lack of motivation, anxiety, "stupid" dreams, anger, irritation, agitation, forgetfulness, low energy, and trouble with concentration (Exhibit

B5F/1). On examination, he presented as anxious, irritable, depressed, and agitated with a congruent affect (Exhibit B5F/2). Psychomotor activity was normal (Exhibit B5F/2). Speech and thought content were normal, and he had no hallucinations (Exhibit B5F/2). He was well dressed and groomed (Exhibit B5F/2). He was cooperative with good eye contact (Exhibit B5F/2). He was focused (Exhibit B5F/2). Despite reporting forgetfulness, recent memory was fair while past memory was good, and intelligence was estimated to be average (Exhibit B5F/2-3). Insight and judgment were fair (Exhibit B5F/3). He was diagnosed with bipolar disorder, current episode mixed, unspecified (Exhibit B5F/3). June 2018 neurology notes reflect that recent and remote memory were intact, fund of knowledge was appropriate, and attention span and concentration were normal (Exhibit B3F/10). September 2018 mental health treatment notes reflect that he was stable and feeling good, and he denied feeling depressed, sad, or anxious (Exhibit B5F/11). Sleep improved to six to seven hours per night, and he denied nightmares (Exhibit B5F/11). He denied mood swings, anger, agitation, irritation, mania, and paranoia (Exhibit B5F/11). His energy level was good, and his concentration was fair (Exhibit B5F/11). On examination, his mood was euthymic and calm, and his affect was appropriate, full range, and congruent with mood (Exhibit B5F/11). Cognition was normal, memory for recent and past events was good, and intelligence was estimated to be average (Exhibit B5F/12). Insight into his problems appeared normal, and his judgment was good (Exhibit B5F/12). The remainder of his mental status examination was unchanged (Exhibit B5F/11-12).

[Plaintiff] was hospitalized for several days in November 2018 due to a suicide attempt via overdosing on medication (Exhibits B8F; B11F; B12F/7-67). He wanted to leave but was pink slipped (Exhibit B11F/15). He had a history of multiple assaults and reported shooting at others a couple of months prior, and he did not appear remorseful (Exhibit B11F/25). After that hospitalization, neurology notes indicate that he reported being forgetful and mixing up his words after several "blows to the head" (Exhibit B9F/4). He also had issue with reading comprehension (Exhibit B9F/4). Mental health treatment notes from after his hospitalizations show complaints of flashbacks after being beat up in the hospital, and he reported increased anxiety and depression with low energy and trouble sleeping (Exhibit B29F/15). On examination, he had pressured speech, an irritable mood, and blunted affect, but the remainder of his mental status examination was unremarkable (Exhibit B29F/15). He was cooperative with average eye contact (Exhibit B29F/15). There were no signs of hyperactive or attentional difficulties (Exhibit B29F/15). Cognition was normal, and insight and judgment were fair (Exhibit B29F/15). April 2019 neurology notes show complaints of progressive short-term memory loss (Exhibit B13F/1). He stated his mood was stable (Exhibit B13F/1). On examination, repetition was intact, fund of knowledge and general recall were appropriate, and attention span and concentration were normal (Exhibit B13F/3). Mental health treatment notes reflect that he was not taking his medication as prescribed (Exhibit B29F/24). With the exception of mood and reports of forgetfulness, his mental status examination was unremarkable (Exhibit B29F/24-25). His PHQ-9 score of 10 indicated moderate depression (Exhibit B29F/24). The

next month, his PHQ-9 score improved to 6, indicating mild depression, though he suggested having an inadequate response to treatment (Exhibit B29F/27). He reported taking medications regularly despite stopping three of them, and he was only taking one of his Cymbalta doses (Exhibit B29F/27). He reported agitation, irritation, nightmares, poor concentration, and forgetfulness, but he denied mood swings, anger, or hallucinations (Exhibit B29F/27). Nevertheless, his mental status examination was unremarkable except for his mood and reported forgetfulness (Exhibit B29F/27-28). His PHQ-9 improved to 4 in June 2019, indicating no to minimal depression (B29F/30). He acknowledged improvement despite not taking all of his medication, and he denied feeling depressed or anxious (Exhibit B29F/30). He indicated improved memory with less medication, and he denied mood swings, anger, agitation, irritation, nightmares, or hallucination with improvement in concentration (Exhibit B29F/30). ***

By October 2019, his PHQ-9 score had improved to 2, continuing to suggest no to minimal depression (B29F/41). He reported some memory problems and forgetfulness but denied depression, anxiety, mood swings, anger, irritation, agitation, nightmares, suicidal ideation, homicidal ideation, and hallucinations (Exhibit B29F/41). He acknowledged fair concentration (Exhibit B29F/41). His mental status examination was generally unchanged from prior visits (Exhibit B29F/41). His subjective complaints, mental status examinations, and self-reported PHQ-9 scores continued to be relatively stable until August 2021 (Exhibit B29F/41-98). In a December 2019 form, [Plaintiff]'s psychiatric nurse practitioner only noted signs and symptoms of poor memory, social withdrawal or isolation, obsessions or compulsions, difficulty thinking or concentrating, and hostility or irritability (Exhibit B16F/1).

May 2020 neurology notes demonstrate that his memory appeared intact in the clinic, and he refused neurocognitive testing despite memory complaints (Exhibit B33F/17). In August 2021, [Plaintiff]'s PHQ-9 score increased to 11, indicating moderate depression (Exhibit B29F/98). He ran out of medications but suggested he was doing fine without some of them (Exhibit B29F/98). His mental status examination was generally unchanged from prior visits (Exhibit B29F/99). September 2021 pain management notes reflect that he had been out of his depression medication for several weeks (Exhibit B31F/91). At his next mental health appointment, he stated he was not doing fine without the medication he had stopped using, though his mental status examination continued to be unchanged (Exhibit B29F/101-102). October 2021 mental health treatment notes reflect that he reported doing better and improving when taking some medication regularly (Exhibit B29F/104). Though he continued to report some symptomology, he generally reported he was "doing fine" without any significant changes in his mental status examination into 2023 (Exhibit B29F/105-142). November 2022 neurology notes reflect that attention span and concentration were grossly intact (Exhibit B33F/5). Memory was within normal limits, and he had awareness of current events and past history (Exhibit B33F/5). In February 2023, [Plaintiff] reported he was "doing fine" with less depression and anxiety (Exhibit B36F/1).

With the exception of his mood and some forgetfulness, no abnormalities were noted on his mental status examination (Exhibit B36F/2).

August 2023 mental health treatment notes reflect trouble sleeping, and he stopped taking medication due to side effects, including heartburn, belching, and feeling like bugs were crawling on him (Exhibit B36F/15). Nevertheless, he felt less depressed and anxious with no suicidal or homicidal ideation, fair energy, and no hallucinations, mood swings, anger, agitation, irritation, or nightmares (Exhibit B36F/14). He noted some forgetfulness, but he acknowledged that his concentration was fair (Exhibit B36F/14). On examination, he had an anxious and depressed mood with reports of forgetfulness, but the remainder of his mental status examination was unremarkable (Exhibit B36F/15). Speech was normal, and thought processes were logical (Exhibit B36F/15). Thought content was normal, and there were no hallucinations or other abnormalities of perception (Exhibit B36F/15). He reliably denied suicidal or homicidal thoughts (Exhibit B36F/15). He was cooperative and attentive with no gross behavioral abnormalities (Exhibit B36F/15). There were no signs of hyperactive or attentional difficulties (Exhibit B36F/15). Despite some forgetfulness, intelligence waws estimated to be average (Exhibit B36F/15). Judgment was good, and insight into problems appeared normal (Exhibit B36F/15). The undersigned notes that pain management notes regularly reflect some forgetfulness and slowed mentation (e.g. Exhibit B31F). ***

(R. at 1595–97).

## C.     The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements through September 30, 2019, and has not engaged in substantial gainful activity since August 15, 2015, his alleged onset date of disability.  (R. at 1580).  The ALJ determined that Plaintiff suffers from the severe impairments of epilepsy, cervical and lumbar degenerative disc disease, aortic aneurysm status post surgery, left elbow epicondylitis, cubital tunnel syndrome status post release, bursitis of the shoulders, Dupuytren's disease, diabetes mellitus, depression/bipolar disorder, anxiety, OCD, and alcohol abuse.  (*Id.*).  The ALJ, however, found that since August 15, 2015, none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment.  (*Id.*)

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record [the ALJ] find[s] that since August 15, 2015, [Plaintiff] has the residual functional capacity to perform sedentary work

15

as defined in 20 CFR 404.1567(a) and 416.967(a) with lifting and/or carrying ten pounds occasionally and less than ten pounds frequently. He is able to stand and/or walk for about two hours in an eight-hour workday and sit for about six hours in an eight-hour workday. He is able to frequently push and/or pull. He is limited to no climbing of ladders, ropes, or scaffolds with frequent balancing and occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs. He is limited to occasional reaching overhead bilaterally with frequent reaching in all other directions, and he is able to frequently handle, finger, and feel bilaterally. He should avoid vibration, flashing lights, unprotected heights, dangerous machinery, and commercial driving. He is able to perform tasks but not at a production rate pace and without strict performance quotas. He is limited to occasional superficial contact with coworkers and supervisors with "superficial contact" defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice. [Plaintiff] is limited to no interaction with the general public. He is able to tolerate occasional changes to a routine work setting defined as one to two per week.

(R. at 1583).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. at 1585).

Relying on the vocational expert ("VE")'s testimony, the ALJ concluded that Plaintiff has been unable to perform his past relevant work as a glass installer and a roof helper. (R. at 1601–02). Relying on the VE's testimony and considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed prior to May 21, 2023, such as a weight tester, bench assembler, and addresser. (R. at 1602–03). Therefore, he found that Plaintiff was not disabled prior to May 21, 2023. (R. at 1604).

The ALJ then found that on May 21, 2023, Plaintiff's age category changed from "a younger individual age 45–49" to "an individual closely approaching advanced age." (R. at 1602). Because of this, and also considering Plaintiff's education, work experience, and residual

functional capacity, the ALJ concluded there are no jobs that exist in significant numbers in the national economy that Plaintiff could perform beginning on May 21, 2023. (R. at 1603). Therefore, the ALJ found Plaintiff became disabled on May 21, 2023, and has continued to be disabled. (R. at 1604).

## II.   STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Olive*, 2007 WL 5403416, at *2 (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.   DISCUSSION

Plaintiff maintains that the ALJ's current analysis of three medical opinions fails to comply with this Court's prior remand order. (Doc. 8 at 11–16). Plaintiff also argues that the ALJ erred

by rejecting an opined limitation without a meaningful explanation and by failing to fully develop the record. (*Id.* at 16–19). The Commissioner responds that the ALJ did not commit the same errors identified by the previous remand order, properly evaluated the opinion evidence, and was under no duty to further develop the record. (Doc. 10 at 4–14).

The Court first discusses the issue that warrants remand, then briefly attends to Plaintiff's other assigned errors.

### A. Routine, Repetitive, and Two-to-Three Step Tasks

In October 2018 and May 2019, state agency psychological consultants Dr. Karla Delcour and Dr. Bonnie Katz reviewed Plaintiff's medical records and opined as to Plaintiff's mental residual function capacity. (*See* R. at 138 (initial determination), 157 (reconsideration)). Plaintiff says the ALJ's assessment pertaining to one of the doctors' opined limitations was deficient. More specifically, Plaintiff claims the ALJ reversibly erred when he "expressly reject[ed] the opinions of Drs. Delcour and Katz to the extent the consultants opined that Plaintiff's mental health impairments would restrict him to routine, repetitive, and two-to-three step tasks." (Doc. 8 at 15). The Court agrees.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [his] impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). When determining the RFC, the ALJ must evaluate several factors, including medical evidence, medical opinions, and the plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). In doing so, the ALJ must resolve conflicts in the record. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). To that end, an ALJ "is only required to include in the residual functional

capacity those limitations he finds credible and supported by the record." *Beckham v. Comm'r of Soc. Sec.*, No. 1:19-cv-576, 2020 WL 5035451, at *7 (S.D. Ohio Aug. 26, 2020) (quoting *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020)).

At the outset, the Court notes that an ALJ is not required to recite medical opinions verbatim. *Poe*, 342 F. App'x at 157. Still, an ALJ "must meaningfully explain why certain limitations are not included in the RFC determination—especially when such limitations are set forth in opinions the ALJ weighs favorably." *Howard v. Comm'r of Soc. Sec.*, No. 3:14-CV-364, 2015 WL 8213614, at *4 (S.D. Ohio Dec. 9, 2015), *report and recommendation adopted*, No. 3:14-CV-364, 2016 WL 99114 (S.D. Ohio Jan. 7, 2016). And an ALJ must provide an explanation that allows this Court to conduct a meaningful review of the decision. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'" (quoting 5 U.S.C. § 557(c)(3)(A))).

Both Dr. Delcour and Dr. Katz opined that on the record they reviewed, Plaintiff did not have limitations related to understanding or memory. (R. at 137, 155). But they also both opined that he had limitations related to his ability to sustain concentration and persist. (R. at 137, 155). Specifically, they wrote that Plaintiff would be moderately limited in his ability "to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. at 137, 156). They went on to explain his limitations in narrative form: "[Plaintiff] is likely to have difficulty with complex tasks but he is able to sustain attention and concentration to carry out routine, repetitive, and 2–3 step work tasks with adequate persistence and pace." (R. at 137, 156).

The ALJ evaluated Drs. Delcour and Katz's opinions as follows:

> ***Additionally, the undersigned notes that Drs. Delcour and Katz opined [Plaintiff] had no limitation in understanding, remembering, or applying information, which does not support their limitation to routine, repetitive, and two- to three-step tasks (Exhibits B3A, B4A, B7A, and B8A). As such, that limitation was not adopted, as it is not supported by the record (Exhibits B1F-B38F). Despite alleging forgetfulness, [Plaintiff] refused neurocognitive testing, and neurology notes generally reflect that recent and remote memory were intact and within normal limits, and his fund of knowledge was appropriate (e.g. Exhibits B3F/10; B33F/5, 17). Accordingly, the opinions of Drs. Delcour and Katz are mostly persuasive.

(R. at 1599).

Despite the doctors expressly connecting the limitation to routine, repetitive, and 2–3 step work tasks to Plaintiff's ability to sustain concentration and persist, the ALJ here discusses Plaintiff's memory in rejecting them. (*Id.*). He does not explain why the two categories, "understanding and memory" and "sustained concentration and persistence," are the same. (*See, e.g.*, 137 (classifying "understanding and memory" and "sustained concentration and persistence" as distinct categories)). Nor does he explain why the record evidence related to Plaintiff's memory is relevant in considering the opined limitations at issue. This is especially puzzling when the doctors expressly linked these limitations to the impact of Plaintiff's psychologically based symptoms, not his ability to understand, remember, or apply information.

The ALJ may have saved his conclusion by providing an explanation of how the record reviewed by the doctors or the record as a whole supports Plaintiff's ability to sustain concentration and persist in the workplace absent the opined limitations. But he did not. Instead, he merely states the limitation "is not supported by the record (Exhibits B1F-B38F)." (R. at 1599). To be clear, when the ALJ cites to exhibits B1F through B38F, he cites to over 2,000 pages of the record. This type of citation does not facilitate judicial review because it is indiscernible what evidence supports the ALJ's conclusion that Plaintiff does not require restrictions to routine, repetitive, and 2–3 step work tasks. In other words, the explanation provided for not adopting these limitations

in an opinion the ALJ otherwise found "mostly persuasive" was not meaningful. *See Howard*, 2015 WL 8213614, at *4.

Accordingly, the ALJ's conclusion as to Plaintiff's ability to sustain concentration and persist is not supported by substantial evidence. *See Reynolds*, 424 F. App'x at 414. He failed to create a logical bridge between the evidence and his conclusion that enables judicial review. *See Davis*, 2019 WL 5853389, at *5. As a result, remand is appropriate.

**B.     Other Assigned Errors**

Plaintiff raises four additional assignments of error. The Court's decision to reverse and remand on the issue above alleviates the need for in-depth analysis of these remaining assignments of error. Nonetheless, the Court addresses them briefly.

*1.     Prior Remand Order*

The Court previously remanded this case after it found that the ALJ's evaluations of medical opinions completed by Jeremy Sturgill, Tracy Pankey, and Drs. Delcour and Katz were not supported by substantial evidence. (R. at 1688–1694). Plaintiff alleges the ALJ failed to follow this Court's remand order on all three evaluations. (Docs. 8, 11).

In reviewing the current decision, it appears the ALJ attempted to address the substantial evidence issues discussed in the prior remand order. (*Compare* R. at 1688–89 (holding the ALJ's conclusion in considering Jeremy Sturgill's opinion that Plaintiff received entirely "conservative treatment" not supported by substantial evidence) *with* R. at 1598–1600 (defining "conservative treatment" as nonsurgical intervention and considering Plaintiff's injections and surgeries with respect to his back, neck, and upper extremities); *compare* R. at 1692 (holding the ALJ's finding regarding the severity of Plaintiff's mental health symptoms was not supported by substantial evidence) *with* R. at 1595–96, 1600 (detailing Plaintiff's mental health symptoms and

hospitalizations and finding Tracy Pankey's opinion unsupported by her attached notes); *compare* R. at 1694 (finding error when the ALJ failed to adopt or explain the non-adoption of Dr. Delcour and Dr. Katz's opinions that Plaintiff be limited to superficial contact with coworkers) *with* R. at 1583 (restricting Plaintiff to occasional superficial contact with coworkers and supervisors). Still, on remand, the ALJ may consider these assignments of error if appropriate.

### 2.    Development of the Record

Finally, Plaintiff contends that the ALJ failed to develop the record fully and fairly with respect to Plaintiff's multi-factor elbow pathology. (Doc. 8 at 16). He submits that the state agency physical health reviewers, Drs. McKee and Hall, could not meaningfully address Plaintiff's elbow impairments because the relevant medical record was developed after their review of the record in 2018 and 2019. (*Id.* at 17; *see* R. at 135–36, 170–71). Therefore, the ALJ's RFC findings have "no reasonable foundation in creditable medical opinion evidence." (Doc. 8 at 17).

Drs. McKee and Hall opined that on the record they reviewed, Plaintiff's manipulative abilities allowed for only occasional overhead reaching but unlimited handling, fingering, and feeling. (R. at 135, 154). The ALJ considered evidence related to Plaintiff's upper extremities and elbow pathology that occurred in the years between the doctors' opinions and his final decision. (*See* R. at 1588–91, citing *e.g.*, 2060, 2102, 2105, 2109, 2264, 2349, 2394, 2758–60). The ALJ concluded that Plaintiff required more manipulative limitations than those opined by the doctors, as the record in the time interim demonstrated "a change in [Plaintiff's] condition with respect to his upper extremities after these opinions were provided, which required surgeries bilaterally[.]" (R. at 1598; *compare* R. at 1583 (the ALJ's RFC determination) *with e.g.*, R. at 134–35 (the state agency reviewers' opined limitations)). Plaintiff contends because Drs. McKee and Hall did not review Plaintiff's records after 2019, the ALJ's RFC conclusions related to

Plaintiff's ability to reach, lift, carry, handle, finger, and feel were made based on no medical source opinion or an outdated source opinion "that did not include consideration of a critical body of objective medical evidence." (Doc. 8 at 17–18, citing *Anita Lynn H.-J. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-025, 2022 WL 10686665 (S.D. Ohio June 23, 2022*)* and *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011)); *see also Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008).

Yet, again, because the Court is remanding this case, it need not determine whether the ALJ should have ordered an updated medical opinion as to Plaintiff's physical functioning. On remand, Plaintiff remains free to seek or request such an opinion for the ALJ's consideration. The ALJ's evaluation on remand may be better facilitated by the state agency physicians' further review of Plaintiff's functional limitations during the period at issue. But if the ALJ does not consider it necessary, he should explain the basis for that determination.

***

One final note. Plaintiff asks that, if the Court determines additional proceedings are necessary, the Court directs the Social Security Administration to not disturb the prior disability finding for the period since May 21, 2023, on remand. As the Commissioner's opposition to Plaintiff's Statement of Errors does not discuss the disability finding for the period beginning on May 21, 2023, (*see generally* Doc. 10), the Court sees no reason that part of the ALJ's decision should be disturbed. (*See* R. at 1604 (finding Plaintiff became disabled on May 21, 2023, and has continued to be disabled through the date of the decision)).

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 8) be **GRANTED**. The Court **REVERSES** the Commissioner's non-disability finding for the period

prior to May 21, 2023, and **REMANDS** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

IT IS SO ORDERED.

Date:   October 17, 2024                                    /s/ Kimberly A. Jolson
                                                           KIMBERLY A. JOLSON
                                                           UNITED STATES MAGISTRATE JUDGE